# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **ROBERT LEE RASMUSSEN, JR.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:15-cv-00162** |
| | ) | **Chief Judge Crenshaw** |
| **NANCY BERRYHILL,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

Pending before the Court is Robert Lee Rasmussen, Jr.'s Motion for Judgment on the Administrative Record[1] (Doc. No. 16), filed with a Memorandum in Support (Doc. No. 17). The Commissioner of Social Security has filed a Response in Opposition. (Doc. No. 20). On February 26, 2015, this case was referred to the Magistrate Judge for, *inter alia*, a Report and Recommendation on disposition of the Complaint for judicial review of the Social Security Administration's decision. (Doc. No. 3). The Court hereby withdraws that referral. Upon consideration of the parties' filings and the transcript of the administrative record (Doc. No. 10)[2] and for the reasons set forth below, Plaintiff's Motion will be denied.

## I.     PROCEDURAL HISTORY

Plaintiff applied for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act in May 2011, alleging a disability onset of April 1, 2010. (A.R. 127-128). His claim

---

[1] The Court notes that Plaintiff's counsel inadvertently refers to a different client in the motion.

[2] The Court will reference, hereinafter, the transcript of the administrative record by the abbreviation "A.R." The page number citations will refer to the page numbers as set out in the Court Transcript Index. That is, they will refer to the bold page number at the lower right corner of the page.

was denied both at the initial and reconsideration stages of state agency review. (A.R. 74-76, 81-82). Plaintiff subsequently requested a review of his case by an ALJ (A.R. 85-86), who held a hearing on June 20, 2013 (A.R. 32-71). Among those present at the hearing—physically or via telephone—were Plaintiff, his attorney, his wife, and an impartial vocational expert. (A.R. 32). On August 30, 2013, the ALJ issued an unfavorable notice of decision. (A.R. 10-31). That decision contains the following findings:

1. The [Plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2015.

2. The [Plaintiff] engaged in substantial gainful activity . . .

3. However, there has been a continuous 12-month period(s) during which the [Plaintiff] did not engage in substantial gainful activity . . .

4. The [Plaintiff] has the following severe impairments: Bipolar Disorder, with psychosis; Alcohol Abuse (20 CFR 404.1520(c)).

5. The [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

6. After careful consideration of the entire record, . . . the [Plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He is limited to simple, routine and repetitive tasks that require no contact with the public, no more than occasional contact with coworkers and supervisors, and there [sic] workplace changes are no more than infrequent and gradually introduced.

7. The [Plaintiff] is unable to perform any past relevant work (20 CFR 404.1565).

8. The [Plaintiff] was born on May 28, 1954 and was 55 years old, which is defined as an individual of advanced age, on the alleged disability onset date (20 CFR 404.1563).

9. The [Plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [Plaintiff] is "not disabled," whether or not the [Plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Considering the [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform (20 CFR 404.1569 and 404.1569(a)).

12. The [Plaintiff] has not been under a disability, as defined in the Social Security Act, from April 1, 2010, through the date of this decision (20 CFR 404.1520(g)).

(A.R. 15-27.)

On December 19, 2014, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner of Social Security. (A.R. 1.) Thereafter, Plaintiff timely filed this civil action (Doc. No. 1), and this Court has jurisdiction. 42 U.S.C. § 405(g).

## II.    REVIEW OF THE RECORD[3]

The following summary of the medical and opinion evidence is derived from the ALJ's decision:

Exhibits 16-F and 17-F, from Summit Medical Center, was reviewed for historical purposes. It shows that the claimant was admitted for psychiatric hospitalization from October 29 to November 4, 2009, and again from November 8-12. It shows that just prior to the first admission, the claimant had a history of alcoholism, but had not used any for about two months. At the same time, about two weeks before admission, he ran out of Celexa, a previously prescribed anti-depressant. His symptoms accelerated at that point. About one week prior to admission, he also began hearing a voice that told him that his best friend was dead.

Following the first admission, he was initially stabilized using Abilify, but it was felt that his release was premature because he was not adequately monitored. He was readmitted on November 8 because in the interim he became depressed, had

---

[3] In Plaintiff's application for disability, he alleged that he could not work due to diabetes mellitus, schizophrenia with audiology [sic] psychosis, hypertension, hypothyroidism, and high cholesterol. (A.R. 140). The ALJ also considered the following physical impairments (A.R. 16): anemia (A.R. 171), visual problems (A.R. 179-181), and elevated liver function studies (A.R. 242). At the hearing, Plaintiff's representative acknowledged that Plaintiff's claim for disability mainly rested on his alleged mental impairments. (A.R. 65). The ALJ made this point in his decision and, having decided that the weight of evidence did not support a finding in favor of any *physical* impairments, focused exclusively on Plaintiff's mental impairments, with corresponding symptoms and limitations. (A.R. 16-17). For that reason, the summary of the record that follows does not mention evidence related to alleged physical impairments.

suicidal thoughts, and heard voices. Treatment continued to involve adjustment of psychotropic medications. The claimant continued to abstain from drinking.

Exhibit 1-F, from James N. Sullivan, M.D.[4] relates to medical encounters and treatments taking place between August 2005 and May 2011. As such, the bulk of the items are very remote relative to the alleged onset date. Nonetheless, the noteworthy items may be summarized below-

| Date | Page(s) | Description | Remarks |
|---|---|---|---|
| 12/07/2009 | 57 | Claimant states he quit drinking about three months before. Physician relates a/v hallucinations to the alcohol consumption, noting that such symptoms are not unusual in the setting of alcohol withdrawal. | |
| 07/02/2010 | 55 | First office encounter since the preceding December (2009). Alleges hallucinations throughout the day. No information regarding alcohol this visit, but see page 54. | **Still noted to be working full-time.** |
| 08/26/2010 | 54 | Atypical psychosis in the setting of 4-5 beers daily. Prescribed medications decreased and spouse reports that psychosis is as good of control as she has ever seen it. | |
| 10/22/2010 | 53 | Here for evaluation on physical medical conditions. Denies hallucinations at this point. Was consuming 6-10 beers daily, but now alleges 2-3 beers daily or every other day. Diagnosis includes atypical psychosis (stable). | |
| 04/14/2011 | 50 | Increased auditory hallucinations. Drinking at least one six-pack of beer daily. States he could not | **Still noted to be working.** |

---

[4] It appears that the ALJ inadvertently referenced the incorrect physician here. Although the record contains a medical opinion from James N. Sullivan (A.R. 354-55, Ex. 12F), Exhibit 1F refers to medical records from Kenneth W. Sullivan, M.D. (A.R. 194-308).

| | | | |
|---|---|---|---|
| | | function with medications as then prescribed. | |
| 05/13/2011 | 49 | Alleges hearing voices, with variable control of symptoms despite prescribed medication; however, these notes also indicate he was drinking a six-pack of beer per day.  Per Dr., his alcohol affects him as far as these hallucinations are concerned.  **Counseled to quit drinking, but he is having difficulty in deciding to do this.** | |

Exhibit 2-F, from Summit Medical Center, relates to an incident on May 19, 2011 in which the claimant reported a blow to the head with a corresponding 3.0 cm laceration. The incident is mentioned only for informational purposes as the circumstances leading to the injury were left unspecified, there was no indication or evidence of brain trauma, and there is also no mention of mental dysfunction. It is also unclear whether alcohol was a factor in the incident. The claimant would later testify that because of a blood sugar imbalance, he fell with the head striking the corner of his bed, thus causing the laceration.

Exhibit 3-F reflects that on August 3, 2011, the claimant presented to Deborah E. Doineau, Ed.D. for purposes of a mental consultative evaluation.  Although Dr. Doineau was unable to determine whether the claimant was malingering, she noted inconsistencies in the claimant's statements which were enough to provide her with pause.  The claimant stated that he started hearing voices after not drinking for about three days.  He was not taking any medications for the hallucinations, at least not initially. He remained sober for about six months, sustained a relapse, and now reports drinking 2-3 beers [ ] daily. He further alleged that he started hearing voices during the evaluation itself, calling him a "son of a b_____."  Dr.  Doineau's conclusions included the following-

> This very curious claimant complaints [sic] of hearing voices that emerged when he quit drinking two years ago. He is continuing to drink and maintains that he hears the voices whether he drinks or not. If indeed what he is saying is accurate he does appear to be impaired . . . There were [however] questions regarding his credibility and his report was inconsistent with information in records . . .

> A major question in this claimant's entire pathology is...the role of alcohol in the development and maintenance of his psychosis. He maintains that the voices emerge [sic] three days after he quit

drinking and there is certainly suggestion that this occurred during withdrawal initially and may be maintained through continued alcohol consumption. Since the voices are allegedly a major problem, then he would certainly be more functional if he discontinued the usage of alcohol.

The balance of the medical source statement opined towards mild to marked limitations in the claimant's ability to follow instructions, regardless of complexity; moderate interpersonal limitations in all respects; and moderate-to-marked limitations in his ability to respond appropriately to usual work situations and to changes in a routine work setting. . .

Exhibit 15-F, from Elam Mental Health, relates to medical encounters and treatments dated between July 2012 and May 2013. These may be summarized as follows:

| Date | Page(s) | Description | Remarks |
|---|---|---|---|
| 07/23/2012 | 26-30 | Here for initial consultation. Alleges that he hears voices that are abusive and tell him to kill himself in setting of continued alcohol use. Denies suicidal ideation despite the voices. Was at times evasive in answering questions and struggled to maintain eye contact. **States he is thankful that he is alive despite "...living a wreckless [sic] life with booze."** | This was not a formal psychiatric evaluation, but the consulting psychiatric [sic] concluded that such an evaluation would be needed. |
| 08/06/2012 | 21-25 | Initial psychiatric assessment. Alleges hearing voices involving a separate personality ("Nickie Stevens"), which would say abusive things or tell him to kill himself. Such hallucinations are daily. Also visual hallucinations, but these are far less frequent. Does not respond to internal stimuli. Start Haldol, Benedryl [sic], and Ambien. | The Global Assessment of Functioning (GAF) score at this assessment was 60, indicative of no more than moderate limitations of mental functioning. **Drinks 3-4 beers/night.** |
| 08/27/2012 | 19-20 | In the previous week, has had three major outbursts in which he cursed wife and daughter. | **Still drinking 3-4 beers daily.** |

| | | | |
|---|---|---|---|
| | | Inconsistent in taking at least one of the medications. | |
| 10/25/2012 | 17-18 | Progress Note: GAF between 60-70. Increase Haldol, start Inderal. Also started Wellbutrin (p. 13). | |
| 11/08/2012 | 13-14 | Progress Note: Voices are still there, essentially no change. **Counseled towards sobriety**. Continue prescribed medications, except that the second dose of Wellbutrin was taken at an incorrect time. | **Still drinking 3-4 beers daily.** |
| 12/06/2012 | 9-10 | Progress Note: Appears to be a repeat of prior notes. Continue existing medications, but start Lithium. **Counseled towards sobriety.** | **Still drinking 3-4 beers daily.** |
| 03/26/2013 | 6-8 | Alleges continuing to hear voices, telling him he is a "useless son of a b___," and to hurt himself. He knows the voices are not real and does not act on them. Mood, appetite, concentration and energy levels all "ok." GAF 55. Discontinue Haldol and Wellbutrin, start Seroquel. **Specifically advised the patient to quit alcohol.** | Drinking 12 beers weekly (possibly a typo for 1-2 times weekly, but *may* reflect about 2 beers daily, still a decrease). |
| 04/04/2013 | 3-5 | Alleges continuing to hear voices. Has not yet started the Seroquel, and ran out of the Lithium. GAF 55. Continue current therapy. **Specifically advised the patient to quit alcohol.** | States he drinks 1-2 beers weekly. |
| 05/10/2013 | 1-2 | Alleges continuing to hear voices and that it was so bad he had to leave church last Sunday because the voices were cursing him out, yet he also denied paying attention to them and knows they are not real. Appetite, concentration and energy levels all "ok." | States he drinks 1-2 beers weekly. |

| | | GAF 60.  Dosage of Seroquel modified.  Low risk for self-harm.  **Specifically advised the patient to quit alcohol.** | |
|---|---|---|---|

(A.R. 21-23.)

## III.    ANALYSIS

### A.  Standard of Review

"The Commissioner determines whether a claimant is disabled and entitled to benefits, 42 U.S.C. § 405(h), and [this Court's] review of this decision 'is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards[.]'" <u>Gentry v. Comm'r of Soc. Sec.</u>, 741 F.3d 708, 722 (6th Cir. 2014) (quoting <u>Rogers v. Comm'r of Soc. Sec.</u>, 486 F.3d 234, 241 (6th Cir.2007)).  "Substantial evidence lies between a preponderance and a scintilla; it refers to relevant evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" <u>Gibbens v. Comm'r of Soc. Sec.</u>, 659 F. App'x 238, 243 (6th Cir. 2016) (quoting <u>Rogers</u>, 486 F.3d at 241).  The Commissioner's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion.  <u>Brooks v. Comm'r of Soc. Sec.</u>, 531 F. App'x 636, 641 (6th Cir. 2013) (citing <u>Smith v. Sec'y of Health & Human Servs.</u>, 893 F.2d 106, 108 (6th Cir.1989)).  However, in determining the substantiality of the evidence, a court must examine the record as a whole, taking into consideration "'whatever in the record fairly detracts from its weight.'" <u>Id.</u> (quoting <u>Garner v. Heckler</u>, 745 F.2d 383, 388 (6th Cir. 1984)).

This Court may not "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" <u>Ulman v. Comm'r of Soc. Sec.</u>, 693 F.3d 709, 713 (6th Cir. 2012) (quoting <u>Bass v. McMahon</u>, 499 F.3d 506, 509 (6th Cir. 2007)).  "Where, however, an ALJ fails to follow agency

rules and regulations, [the Court will] find a lack of substantial evidence, 'even where the conclusion of the ALJ may be justified based upon the record.'" Miller v. Comm'r of Soc. Sec., 811 F.3d 825, 833 (6th Cir. 2016) (quoting Gentry, 741 F.3d at 722).

## B. Administrative Proceedings – the Five-Step Inquiry

A disability is defined by the Social Security Act ("the Act") as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "To determine if a claimant is disabled within the meaning of the Act, the ALJ must follow a five-step analysis, as set forth in 20 C.F.R. § 404.1520." Parks v. Soc. Sec. Admin., 413 F. App'x 856, 862 (6th Cir. 2011). Pursuant to that five-step sequential evaluation process:

(1) a claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings;
(2) a claimant who does not have a severe impairment will not be found to be disabled;
(3) a finding of disability will be made without consideration of vocational factors if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four;
(4) a claimant who can perform work that he has done in the past will not be found to be disabled; and
(5) if a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Id. (citing Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)). Throughout the first four steps of the analysis, the claimant bears the burden of proof. Id. at 863 (citing Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 390 (6th Cir. 2004)). However, at the fifth step, "the burden shifts to the Commissioner to identify 'a significant number of jobs in the economy that

accommodate the claimant's residual functional capacity (determined at step four) and vocational profile.'" Id. (quoting Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 474 (6th Cir. 2003)).

## C. Plaintiff's Claims of Error

Although the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," the ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of [those] symptoms [were] not entirely credible. (A.R. 21.) Plaintiff argues that the ALJ failed to make a proper credibility finding regarding his subjective complaints in violation of SSR 96-7p, 20 C.F.R. § 404.1529, and 20 C.F.R. § 416.929. Specifically, Plaintiff contends that the ALJ 1) repeatedly "refer[red] to Plaintiff's history of alcohol consumption as a significant factor in undermining [his] credibility," but "stop[ped] short of finding alcohol a material and contributing factor;" 2) rejected the testimony of Plaintiff's wife; 3) used Plaintiff's assigned GAF score to reduce the severity of Plaintiff's mental impairments and symptoms; and 4) failed to mention consistencies between Plaintiff's testimony and evidence in the record. (Doc. No. 17 at 10-12.) The Court will address these claims of error in reverse order.

### i. Alleged Failure to Mention Consistencies

Plaintiff argues that the ALJ failed to mention consistencies between Plaintiff's testimony and "opinions of his treating doctors and the clinical findings well-documenting his hallucinations, involuntary movements and easy agitation." (Id. at 12.)

"[S]ubjective complaints of a claimant can support a claim for disability, if there is also evidence of an underlying medical condition in the record." Cruse, 502 F.3d at 542 (internal quotation marks and citations omitted). Where objective medical evidence establishes a medical impairment that could reasonably be expected to produce the alleged disabling symptoms, the

intensity and persistence of those symptoms are evaluated to determine the limitations they place on the claimant's ability to work. 20 C.F.R. § 404.1529(c)(1); SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996).[5] "Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints 'based on a consideration of the entire case record.'" Rogers, 486 F.3d at 247. "Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect." Id. at 248. Additionally,

> [r]elevant factors for the ALJ to consider in his evaluation of symptoms include the claimant's daily activities; the location, duration, frequency, and intensity of symptoms; factors that precipitate and aggravate symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; other treatment undertaken to relieve symptoms; other measures taken to relieve symptoms, such as lying on one's back; and any other factors bearing on the limitations of the claimant to perform basic functions.

Id. at 247 (citing 20 C.F.R. § 416.929 and SSR 96-7p, 1996 WL at *2-3). Where an ALJ's credibility determinations are supported by substantial evidence, reviewing courts give their decisions great weight. Cruse, 502 F.3d at 542 (quoting Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997)).

Here, the ALJ analyzed Plaintiff's complaints of allegedly disabling symptoms and found Plaintiff's testimony not entirely credible in light of the record. The Court finds that the ALJ's

---

[5] Effective March 16, 2016, SSR 16-3p superseded SSR 96-7p. See SSR 16-3p, 2016 WL 1119029 (S.S.A. March 16, 2016). As the ALJ's findings and conclusions were made prior to March 16, 2016, the Court applies SSR 96-7p. See Cameron v. Colvin, No. 1:15-CV-169, 2016 WL 4094884, at *2 (E.D. Tenn. Aug. 2, 2016) (explaining that SSR 16-3p is not applied retroactively).

analysis complies with 20 C.F.R. § 404.1529(c) and SSR 96-7p and is supported by substantial evidence.

As an initial matter, although Plaintiff alleges that "opinions of his treating doctors and clinical findings" support his testimony (Doc. No. 17 at 12), Plaintiff fails to explain which opinions and clinical findings the ALJ allegedly failed to consider. The ALJ considered the evaluations of Kenneth W. Sullivan, M.D.[6], with whom Plaintiff had medical encounters between August 2005 and May 2011. (A.R. 21, 194-308.) The ALJ noted that most of the medical notes from Dr. Sullivan were remote compared to the alleged disability onset date of April 1, 2010, but then summarized encounters Dr. Sullivan had with Plaintiff between 2009 and 2011. (A.R. 21-22.)

Even though Plaintiff told Dr. Sullivan that he had hallucinations, Dr. Sullivan noted Plaintiff as working full-time at points in 2010 and 2011 after his alleged disability onset date.[7] (A.R. 15, 21-22, 243, 248). That, in conjunction with Plaintiff's termination from his former jobs around and after the date of alleged disability onset for reasons unrelated to his alleged impairments (A.R. 15, 24, 40-42, 44-45, 52, 146), was a basis on which the ALJ declined to accept that Plaintiff had marked or extreme limitations. (A.R. 18, 25.) This supports a finding that Plaintiff's symptoms were not as limiting as he claimed. See Workman v. Comm'r of Soc. Sec., 105 F. App'x 794, 801 (6th Cir. 2004) ("Although Workman alleges a disability onset date of June 30, 1998, the record indicates that this is the date that Workman's employer laid him off due to economic reasons."); see also Maloney v. Apfel, 211 F.3d 1269 (Table), 2000 WL 420700, at *2 (6th Cir. 2000) ("Maloney stopped working for reasons other than her illness. Even if Maloney

---

[6] See Footnote 6.

[7] The Court notes that the ALJ gave Plaintiff the benefit of the doubt with respect to his testimony that he was not working in 2011 because a review of the earning records reflects zero in that year. (A.R. 15).

had documented her symptoms during her insured status, there was no disabling impairment that caused her to cease work.").

Further, Plaintiff testified that he applied for unemployment compensation (A.R. 42), which he received (A.R. 136). Therefore, the ALJ was correct in concluding that "the fact that [Plaintiff] appealed the firing . . . and won unemployment benefits also presents a reasonable inference that [Plaintiff] had certified to the State unemployment authority that he was willing and able to work." (A.R. 24); see Workman, 105 F. App'x at 801 (citations omitted) ("Applications for unemployment and disability benefits are inherently inconsistent."). Receipt of unemployment compensation supports the ALJ's finding that Plaintiff's testimony was not entirely credible and weighs against a finding of disability.

The ALJ also permissibly considered Plaintiff's daily activities in evaluating his subjective complaints. See Temples v. Comm'r of Soc. Sec., 515 F. App'x 460, 462 (6th Cir. 2013) ("Further, the ALJ did not give undue consideration to Temples' ability to perform day-to-day activities. Rather, the ALJ properly considered this ability as one factor in determining whether Temples' testimony was credible."). The ALJ noted that even though both Plaintiff and his wife testified that his auditory hallucinations affected his ability to attend church and perform chores at home (A.R. 18, 47, 58-59), the medical record indicated that Plaintiff was able to discuss his symptoms and treatment options with his doctors and ignore the voices because he knew they were not real (A.R. 18, 23, 415, 418, 420). In his function report, Plaintiff indicated that he cannot "work, sleep and be around people" and that he "used to cook daily, but has no desire now." (A.R. 148-149.) Nevertheless, Plaintiff affirmed being able to mow the lawn, go grocery shopping every one to two weeks, and see his parents about once a month and his friends when they visit. (A.R. 149-151.) The ALJ noted that a report from a licensed psychologist—Dr. Deborah E. Doineau,

Ed.D.—confirmed some of Plaintiff's activities, such as mowing the lawn (albeit, allegedly with interruptions from the auditory hallucinations), helping his wife with chores, cooking full meals, reading his mail, making decisions, going grocery shopping with his wife though he is able to go alone, and looking after his hygiene, among other things. (A.R. 18, 314.) These accounts support the finding that Plaintiff was not as limited as he claimed.

The ALJ focused on the report from Dr. Doineau, whom Plaintiff saw for a consultative mental examination on August 3, 2011. (A.R. 311-321.) In that report, Dr. Doineau identified Plaintiff as having certain "marked," that is serious, limitations. (A.R. 316-317.) The ALJ did not accept all of the limitations identified in the consultative evaluation report (A.R. 25), and the Court assumes that Plaintiff contemplates Dr. Doineau's report when he argues that opinions and findings in the record support his testimony.

First, the ALJ had the authority to decide how much weight to give to Dr. Doineau's report. See Justice v. Comm'r Soc. Sec. Admin., 515 F. App'x 583, 588 (6th Cir. 2013). Dr. Doineau was a non-treating source. See Smith v. Comm'r of Soc. Sec., 482 F.3d 873, 875 (6th Cir. 2007) (citation omitted) ("A 'nontreating source' (but examining source) has examined the claimant 'but does not have, or did not have, an ongoing treatment relationship with' her."). As such, the ALJ was not required to assign Dr. Doineau's report controlling weight. See Ealy v. Comm'r of Soc. Sec., 594 F.3d 504, 514 (6th Cir. 2010); see also Griffith v. Comm'r of Soc. Sec., 582 F. App'x 555, 564 (6th Cir. 2014) ("The opinion of a nontreating source or one-time examiner . . . is not entitled to the degree of deference that is granted to a treating physician."). Rather, in deciding what weight to give Dr. Doineau's opinion, the ALJ should have considered factors such as the evidence Dr. Doineau offered in support of her opinion and the extent to which her opinion was consistent with the record as a whole. See 20 C.F.R. § 404.1527(c)(3)-(4). The record reveals

that the ALJ did consider relevant factors when deciding not to assign Dr. Doineau's report "great weight, to the extent it is inconsistent with [the RFC the ALJ assigned Plaintiff], and especially to the extent of the marked limitations."  (A.R. 25.)

The ALJ stated that Dr. Doineau was unable to determine whether Plaintiff was malingering, but she noted inconsistencies in Plaintiff's statements.  (A.R. 22, 311.)  Dr. Doineau also wrote, "It was felt based on information in records that information [Plaintiff] provided may not have been accurate."  (A.R. 311.)  The ALJ noted that Dr. Doineau concluded that "[i]f indeed what [Plaintiff] is saying is accurate[,] he does appear to be impaired . . . There were [however] questions regarding his credibility and his report was inconsistent with information in records." (A.R. 22, 316.)  That Dr. Doineau questioned Plaintiff's credibility gave the ALJ another reason not to fully credit the limitations Dr. Doineau identified in her consultative evaluation report.  (A.R. 25.)  The Court finds that the ALJ reasonably gave Dr. Doineau's report less weight to the extent that she assessed Plaintiff's limitations solely on his subjective complaints.  See Griffith, 582 F. App'x at 564 (citing 20 C.F.R. § 416.927(b)) ("[T]he ALJ is not required to simply accept the testimony of a medical examiner based solely on the claimant's self-reports of symptoms, but instead is tasked with interpreting medical opinions in light of the totality of the evidence."); see also Bell v. Barnhart, 148 F. App'x. 277, 285 (6th Cir. 2005) (declining to give weight to a doctor's opinion that was only supported by the claimant's reported symptoms).

Finally, the ALJ considered and credited the state agency psychological opinions.  (A.R. 25.)  He noted that they, "although outlining moderate limitations within the psychiatric review technique analysis, give very few limitations as part of the residual functional capacity report[.]" (A.R. 25, 333, 337-339).  And, in addition to crediting the findings of the state agency with respect to the identified limitations, the ALJ added on more limitations in Plaintiff's RFC, such as limiting

him to simple, routine, and repetitive tasks, "in an effort to give maximum effect to the claimant's subjective complaints to the extent the limited evidence will allow." (A.R. 25.)

In light of the foregoing, Plaintiff's claim of error that the ALJ failed to mention consistencies between his testimony and evidence in the record, thereby failing to make a proper credibility finding, is without merit. The ALJ's credibility determination is reasonable and supported by substantial evidence.

ii.     **GAF Score**

Plaintiff contends that the ALJ erred by reducing the severity of his mental impairments and symptoms based on his assigned GAF score. "A GAF score is a 'subjective rating of an individual's overall psychological functioning,' which may assist an ALJ in assessing a claimant's mental RFC." Miller, 811 F.3d at 835 (citing Kennedy v. Astrue, 247 Fed. App'x. 761, 766 (6th Cir. 2007)). Although "[a] GAF score may help an ALJ assess mental RFC . . . it is not raw medical data." Kennedy, 247 F. App'x at 766. "The Commissioner has declined to endorse the [GAF] score for use in the Social Security and SSI disability programs, and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings." Id. (internal quotation marks and citations omitted).

In his decision, the ALJ stated that "careful consideration was given towards all of the Global Assessment of Functioning (GAF) score assessments, as contained inside the treatment records at Ex. 15-F." (A.R. 25.) In the treatment record, Plaintiff was assigned GAF scores ranging from 55 to 70. (A.R. 416, 418, 421, 432.) The ALJ, therefore, was correct in finding that the scores "tend[ed] to show [Plaintiff] to have no more than moderate limitations of mental functioning[.]" See Kornecky v. Comm'r of Soc. Sec., 167 F. App'x 496, 511 (6th Cir. 2006) (citing DSM–IV–TR at 34) ("[A] 51–60 indicates moderate symptoms or moderate difficulty in

social or occupational functioning, rather than the more serious symptoms or difficulty in functioning suggested by a score in the 40s.").  And contrary to Plaintiff's assertion that the ALJ *reduced* the severity of his mental impairments and symptoms relying on the GAF scores, the ALJ wrote:

> These assessments . . . does [sic] not detract from the residual functional capacity adopted above; however, they are given neutral weight in the sense that it [sic] does [sic] lend itself [sic] directly to a series of work-related limitations. To seek details as needed towards the latter objective, it was needful to turn more fully to the treatment evidence itself, and the extent of its correlation with the [Plaintiff's] testimony together with those [sic] of his spouse-witness.

(A.R. 25.)  It is clear, then, that the ALJ relied on the record as a whole in order to assess Plaintiff's residual functional capacity.  As such, Plaintiff's assignment of error based on the ALJ's treatment of his GAF scores is meritless.

### iii.    Testimony of Plaintiff's Wife

Plaintiff argues that his wife provided detailed examples of his mental deficiencies and struggles that were "consistent with specific notations in the treatment records."  (Doc. No. 17 at 12.)  Therefore, he contends that the ALJ erred by rejecting her testimony.  The Court disagrees.

"Perceptible weight must be given to lay testimony where . . . it is fully supported by the reports of the treating physicians."  Lashley v. Sec'y of Health & Human Servs., 708 F.2d 1048, 1054 (6th Cir. 1983) (citations omitted); see also Higgs v. Bowen, 880 F.2d 860, 864 (6th Cir. 1988) (finding that although the Appeals Council should have been "more articulate in its decision," failing to explicitly state the weight it attached to the testimony of the claimant's husband was not reversible error where it was clear that the Appeals Council had considered the entire record, not "credit[ing] any testimony at variance with the objective record.").

As an initial matter, the Court notes that Plaintiff does not specify the notations in the treatment record with which his wife's testimony was allegedly consistent.  However, it is clear

that the ALJ considered the wife's testimony and permissibly rejected it.  For example, in his

decision, the ALJ stated the following with respect to the wife's testimony:

> The spouse testified at the hearing that the [Plaintiff's] visual hallucinations were
> so intense that he would identify each of them by name (some as deceased relatives
> or remote or as childhood acquaintances), and would not only respond to them, but
> on one occasion even organized a party in their favor and prepared  vegetable trays.
> This is of highly questionable veracity as one does not find a parallel for this
> characterization of symptoms within the treatment records, and because even the
> [Plaintiff] himself typically described them in a different, disruptive and adversarial
> way *(see, e.g.,* Ex. 3-E at 10, 3-F at 3-4). . . .
>
> Both the [Plaintiff] and his wife, at the hearing, alleged symptoms more consistent
> with marked to extreme limitations.  Even so, it is highly curious that even as the
> voices allegedly disrupt his ability to attend church or to finish even the simplest of
> household chores (for instance, to unload the dishwasher), they do not appear to
> disrupt his ability to interact with medical personnel during the appointment itself
> or to discuss symptoms and treatment options, and he had repeatedly stated that he
> knows the voices are not real and are able to ignore them *(see* Ex. 15-F [Tr. at 418,
> 420]).

(A.R. 18.)  The ALJ also included, in his decision, an accurate summary of the testimony that

Plaintiff's wife provided at the hearing.  (A.R. 20-21.)  Plaintiff's wife testified about Plaintiff's

experiences with auditory (A.R. 56-57) and visual hallucinations (A.R. 58.)  Even though

Plaintiff's initial psychiatric assessment indicates Plaintiff saying that he has visual hallucinations

("'seems like a burger king guy' who talks to [Plaintiff] but [visual hallucinations] are once in 2-

3 months" (A.R. 435)), his psychiatric progress notes indicate that Plaintiff—at points in time

within three months of the hearing—denied having visual hallucinations (A.R. 415, 417, 420.)

The progress notes also indicate, as the ALJ pointed out, that Plaintiff knew that the voices he

heard were not real and he ignored them.  (A.R. 415, 417, 420.)  Furthermore, they indicate, as the

ALJ highlighted, that Plaintiff did not appear to respond to internal stimuli.  (A.R. 20, 415, 417,

420, 431-432.)  In light of this and because making credibility determinations is part of the ALJ's

function, it was not error for the ALJ not to credit the testimony of Plaintiff's wife.  See Rogers,

486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses.").

### iv. Plaintiff's Alcohol Consumption

Plaintiff contends that the ALJ's decision "repeatedly refers to Plaintiff's history of alcohol consumption as a significant factor in undermining Plaintiff's credibility . . . [but] stops short of finding alcohol a material and contributing factor." (Doc. No. 17 at 10.) Plaintiff argues that pursuant to 20 C.F.R. § 404.1535, an ALJ must first determine if a claimant is disabled using the five-step sequential process laid out in 20 C.F.R. § 404.1520 and only then determine whether alcoholism is a contributing material factor to the disability determination.

Plaintiff argues that the record supports a finding that alcoholism is not material because his mental impairments and symptoms are present whether or not he drinks, noting, for example, that his mental problems began when he initially stopped drinking. (Doc. No. 17 at 11.) However, he argues that the ALJ did not apply the process set out in 20 C.F.R. § 404.1535, but simply determined that Plaintiff's symptoms were not credible.

"A claimant cannot receive disability benefits if alcohol or drug abuse is a material contributing factor to the finding of disability." Baker v. Soc. Sec. Admin., No. CIV. 3:14-1240, 2015 WL 666939, at *11 (M.D. Tenn. Feb. 13, 2015) (citing 423(d)(2)(C)). "[T]he five step sequential evaluation process, found in 20 C.F.R. § 404.1520, [must] be followed in the adjudication of disability 'before any consideration is given to whether drug addiction [or alcohol abuse] is the cause of such disability.'" Id. (citing Williams v. Barnhart, 338 F.Supp.2d 849, 862 (M.D. Tenn. 2004)). "To find that drug addiction is a contributing factor material to the determination of disability without first finding the claimant disabled . . . is to put the cart before the horse[.]" Williams, 338 F. Supp. 2d at 862. In other words, in determining whether a claimant

is disabled, the ALJ must not "segregat[e] out any effects that might be due to substance use disorders." Id. at 863 (citing Ball v. Massanari, 254 F.3d 817, 821 (9th Cir. 2001)). However, "[i]f the five step sequential evaluation process, without removing the effects of substance abuse disorders from consideration, indicates that the plaintiff is not disabled then there is no need to continue with the substance abuse materiality analysis of 20 C.F.R. §§ 404.1535 . . ." Baker, 2015 WL at *11 (citing Brueggemann v. Barnhart, 348 F.3d 689, 694-95 (8th Cir. 2003)).

Having reviewed the ALJ's decision, the Court cannot conclude that the ALJ handled Plaintiff's history of alcohol dependence improperly. The ALJ noted places in the record that detail Plaintiff's alcohol use and show that Plaintiff was advised to stop drinking. (A.R. 22-23.) Additionally, the ALJ stated the following with respect to Plaintiff's alcohol use:

> At present, [Plaintiff] asserts that he drinks no more than an occasional beer, or in others, about a couple of beers a week; however, it is important to point out that treating providers have repeatedly tell [sic] him to stop his alcohol consumption, rather than merely reduce it or even greatly curtail it; therefore, even if the claimant's testimony can be accepted as true on this point, it would still go against him from the standpoint of compliance with medical treatment and advice. . . .

> As noted above, the claimant is currently still drinking, but allegedly not to the same extent as he was before. At the hearing, the claimant testified to 1-2 times a week. Some of the notes from 2011 indicate that at that time, he was drinking at least a six-pack a day. Later records indicate reduced consumption in a manner consistent with the hearing testimony; however, this was a very recent development, seeing that such notations appear only starting in March 2013 at the earliest. This presents a reasonable inference that as between the claimant's alcohol relapse in 2010 and a recent date in 2013, the claimant had been drinking at the much higher quantities. Moreover, his continued drinking, even at the reduced levels that he now alleges, goes to compliance with medical treatment and advice, not only because of the drinking itself, but also because of its potential for interactions with prescribed medications.

> Now the undersigned's intention is not to steer the analysis of the decision entirely towards alcohol use-as-being-material. Nonetheless, it is impossible to ignore Dr. Doineau's observations at Ex. 3-F. The reader is directed back to her summary . . . however, to summarize, she emphasized the interaction between the claimant's alcohol consumption and the continuation of his symptoms and his overall level of functioning.

> Moreover, the evaluating psychologist also openly questioned the claimant's credibility in a number of respects. These two issues, along with the fact that the claimant continued working with these alleged symptoms up until the point when his jobs ended for unrelated grounds, are the primary reason why the undersigned is unable to fully accept all of the limitations identified in the consultative evaluation report.

(A.R. 20, 24-25.)

First, an ALJ may use a claimant's non-compliance with treatment as a factor when determining credibility. See Ranellucci v. Astrue, No. 3:11-CV-00640, 2012 WL 4484922, at *9 (M.D. Tenn. Sept. 27, 2012) ("[Evidence that Plaintiff's condition significantly improved with treatment], in addition to Plaintiff's history of general non-compliance with treatment, as evidenced in the record, gave ALJ Roberts substantial evidence to find Plaintiff's testimony regarding the severity of her symptoms not credible."). Therefore, because Plaintiff did not quit drinking altogether, although advised to, the ALJ permissibly counted Plaintiff's lack of compliance against him. (A.R. 20.) That is to say, the ALJ reasonably concluded that Plaintiff's statements concerning the "intensity, persistence and limiting effects of [his] symptoms are not entirely credible" (A.R. 21) because, if they were, Plaintiff would be expected to heed the advice to abstain from alcohol, which he has demonstrated the capacity to do in the past.

Furthermore, even though Plaintiff contends that the ALJ erred by "stop[ping] short of finding alcohol a material and contributing factor" (Doc. No. 17 at 10), the ALJ was not required to make a materiality determination. As stated above, a materiality analysis is only required if an ALJ finds a claimant to be disabled. Here, the ALJ found Plaintiff not disabled even after considering his alcohol abuse to be a severe impairment. (A.R. 16, 27.) The ALJ proceeded to consider Plaintiff's mental functioning for purposes of the Listings without any mention of Plaintiff's alcohol use or its effect on his symptoms. (A.R. 17-19.) In finding Plaintiff not disabled, it does not appear that the ALJ impermissibly segregated out the effects of Plaintiff's

alcohol use. Rather, it seems that the ALJ determined that Plaintiff's symptoms, exacerbated by his alcohol use, nevertheless failed to make Plaintiff disabled within the meaning of the Social Security Act.

The Court notes that it is peculiar that the ALJ stated that his intention was "not to steer the analysis of the decision entirely towards alcohol use-as-being-material." (A.R. 24.) Indeed, the ALJ would have done well to state explicitly that he did not net out the effects of Plaintiff's alcohol use when making his disability determination. However, as far as the Court discerns and as already mentioned, it appears that the ALJ considered the effects of Plaintiff's alcohol use when determining that Plaintiff was not disabled. And per the rest of the discussion in this opinion, the ALJ's ultimate finding that Plaintiff was not disabled is supported by substantial evidence. This is further evidenced by the fact that Plaintiff testified at his hearing that he would "drink up to a 12 pack a day" during a time when he was working and his alcohol use never caused him to lose a job or affect his ability to work. (A.R. 44.) His wife then confirmed this portion of his testimony. (A.R. 55-56.)

## IV. CONCLUSION

For the reasons stated herein, Plaintiff's Motion for Judgment on the Administrative Record (Doc. No. 16) will be denied and the decision of the Social Security Administration will be affirmed. An appropriate Order shall be entered.

IT IS SO ORDERED.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE